### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| PANKAJ KUMAR, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| IVAN CRADDOCK, individually and | ) | |
| on behalf of all other similarly situated | ) | |
| individuals, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16-cv-00905-JAR |
| | ) | |
| | ) | |
| TECH MAHINDRA (AMERICAS) | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM AND ORDER

This matter is before the court on Plaintiffs' Motion for Class Certification (Doc. 95), and Defendant Tech Mahindra (Americas) Inc.'s Motion for Decertification (Doc. 116).  Because the parties' motions are very closely related, the Court will address them in a single memorandum and order.  The motions are fully briefed.  (Docs. 107, 110, 117, 131, 137.)

### Background

Tech Mahindra is a national information technology ("IT") concern that provides consulting, business process outsourcing, and network technology services.  (Doc. 105 at 2.)  Its "core business" is IT services for banks, investment firms, telecommunications companies, and railroads, but it serves more than 300 clients throughout the country.  (Doc. 95-1 at 3.)  Tech Mahindra has roughly 6,000 employees throughout the United States, grouped into ten "families"

1

based on their job duties and corporate role.  (*Id*. at 3-4.)  Plaintiffs[1] are all members of the "IT Delivery" job family, responsible for providing on-site technical services, often inside the client's location.  (*Id*. at 5.)  Each job family is subdivided into three "job bands":  E (for executives and directors); P (for managers); and U (for individual team members).  (*Id*.)  Each job band is further subdivided based on relative seniority; for instance, an entry-level member of the IT Delivery family would be assigned to the U1 band while someone with several years of experience might be a U4.  (*See id*.)  Plaintiffs "all worked in an 'engineer' role under several different job titles in the IT Delivery job family in the U1-U3 band level."  (*Id*.)

Tech Mahindra classifies IT Delivery Engineers as salaried employees who are exempt from overtime protection under the "Computer Professional Exemption."  *See, e.g.*, 29 C.F.R. § 541.400(b).  Exemption under the Fair Labor Standards Act ("FLSA") turns on an employee's "primary duty."  *Id*.  Tech Mahindra argues that IT Delivery Engineers'' primary duties are a combination of activities such as consulting with IT users, and designing, developing, testing, and modifying computer systems or programs.  *Id*.  Plaintiffs maintain that their primary duties differ from those listed in the regulations and that therefore they are not exempt.  (Doc. 105.) They filed suit to recoup unpaid overtime pay and seek to proceed as a collective action under the FLSA and as a class under the wage and hour laws of Missouri and Washington.  (Doc. 105.)

## Certification under § 216(b) of the FLSA

### *1.  Legal Standard*

The FLSA mandates that an employer must pay an employee one and one-half times his or her hourly rate for all hours worked in excess of forty in one workweek, unless the employer can show that the employee is exempt under the Act.  29 U.S.C. § 207.  When an employee

---

[1]  For ease of reference, the Court will use "Plaintiffs" to mean all Named Plaintiffs, opt-in FLSA collective-action members, and all putative members of the proposed Rule 23(a) class action.

believes he was improperly classified as exempt, he may file suit "on behalf of himself . . . and other employees similarly situated" and seek certification under the FLSA to recover unpaid overtime compensation  29 U.S.C. § 216(b).

Courts in this circuit apply a two-step procedure for certification under the FLSA.  *See, e.g.*, *Kennedy v. Boulevard Bank*, No. 4:12CV40 JCH, 2012 WL 3637766, at *2 (E.D. Mo. August 22, 2012); *Ondes v. Monsanto Co.*, No. 4:11CV197 JAR, 2011 WL 6152858, at *2 (E.D. Mo. Dec. 12, 2011); *Perrin v. Papa John's Intern., Inc.*, No. 4:09CV1335 AGF, 2011 WL 4089251, at *2 (E.D. Mo. Sept. 14, 2011); *Beasely v. GC Servs. LP*, 270 F.R.D. 442, 444 (E.D. Mo. 2010); *Littlefield v. Dealer Warranty Servs., LLC*, 679 F. Supp. 2d 1014, 1016 (E.D. Mo. 2010).  First, Plaintiffs move for conditional certification at an early stage in the litigation. *Kautsch*, 504 F. Supp. 2d at 688.  The burden for conditional certification is not onerous and the merits of the claims are not considered, *id.*; Plaintiffs need only make a modest factual showing, based upon the pleadings and affidavits, that the proposed class members were victims of a single decision, policy, or plan.  *Ondes*, 2011 WL 6152858, at *3 (citations omitted).  "Once the Court conditionally certifies the class, potential class members are given notice and the opportunity to 'opt-in.'"  *Kautsch*, 504 F. Supp. 2d at 688 (citing *Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1214 (5th Cir. 1995)).

On July 26, 2017, this Court conditionally certified an FLSA class consisting of:

> All U1-U3 band IT Delivery Engineers employed by Tech Mahindra who were classified as exempt during any workweek at any time three (3) years prior to October 5, 2016 through the entry of judgment.

(Doc. 46 at 6.)

The second step of the process occurs when the defendant moves to decertify the class. (*See* Doc. 116); *Ford v. Townsends of Ark., Inc.*, No. 4:08cv509, 2010 WL 1433455, at *3 (E.D.

Ark. Apr. 9, 2010); *Beasley*, 270 F.R.D. at 444; *Dernovish v. AT&T Operations, Inc.*, No. 09-0015CVWODS, 2010 WL 143692, at *1 (W.D. Mo. Jan. 12, 2010).  Typically, this occurs after significant discovery, when the Court can review evidence from both sides before determining whether the plaintiffs are similarly situated.  "If the [class members] are similarly situated, the district court allows the representative action to proceed to trial.  If not, the district court decertifies the class, dismisses without prejudice the opt-in plaintiffs, and allows the class representative[s] to proceed to trial on [their] individual claims."  *Drake v. Steak N Shake Operations, Inc.*, 286 F. Supp. 3d 1040, 1043 (E.D. Mo. 2017) (quoting *White v. Baptist Mem'l Health Care Corp.,* 08–2478, 2011 WL 1883959, at *4 (W.D. Tenn. May 17, 2011)).  "The decision to certify or decertify a collective action under section 216(b) is within the district court's discretion."  *Id.*

## 2. Analysis

Tech Mahindra argues that decertification is proper for two reasons:  "First, Plaintiffs . . . cannot establish that they are similarly situated for purposes of the principal inquiry in this case:  exempt status"; and "[s]econd, there is no uniform way to determine damages in this case."  (Doc. 117 at 1-2.)

### a. <u>Similarly Situated</u>

Plaintiffs "bear the burden to show that they are similarly situated," *Kautsch v. Premier Comm'ns*, No. 06-CV-04035-NKL, 2008 WL 294271, at *1 (W.D. Mo. Jan. 31, 2008), either by proving that the employer "engaged in a unified policy, plan, or scheme of FLSA violations," or that "their positions are 'similar, not identical' to the positions held by the other class members." *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 372 (E.D. Mo. 2014) (quoting *Kautsch*, 2008 WL 294271, at *1.  Courts analyze three factors to determine whether the plaintiffs are similarly

4

situated:  (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations.  *14051 Manchester*, 301 F.R.D. at 372 (citation omitted). Similarly situated "does not necessarily mean identical."  *Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at *2 (E.D. Mo. Mar. 31, 2017).   "[T]he question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected."  *14051 Manchester*, 301 F.R.D. at 372 (quoting *Baptist Mem'l.*, 2011 WL 1883959, at *4).

Tech Mahindra argues that an individual collective-action member's primary duty is dependent on several factors, creating numerous disparities in the collective-action members' factual and employment settings that make a collective-action impracticable and unfair.  It also argues that Plaintiffs cannot prove that it imposed a "unified policy, plan, or scheme of FLSA violations" because the exemption analysis is too fact-specific and the factual variance among collective-action members is too great.  (Doc. 117.)

### i.    *Disparate Factual and Employment Settings*

Fifty-eight individuals chose to opt-in to the FLSA collective action, two of them voluntarily withdrew, five did not meet the definition of the conditionally certified collective, and four are time-barred.  According to Tech Mahindra, the remaining forty-seven members of the FLSA collective worked in fifteen states holding eight different job titles.  (*Id*. at 4.)  The collective has members from all three job bands.  (*Id*.)   In addition, members worked under thirty-eight different supervisors for fifteen different customers, on at least 120 individual projects.  (*Id*.)  These variables, Tech Mahindra asserts, create significant differences between

members of the collective, material variance within the same job title, and even inconsistency in an individual member's personal work experience.  (*Id*. at 6.)

In support, Tech Mahindra highlights differences in the testimony of several members of the collective.  (*Id*. at 5.)   First, Named Plaintiff Kumar concedes that for most of his employment, he did exempt work.  (Doc. 95-7 at 1; Doc. 117-2 at 10:13-17.)  He spent more than four years as a Software Tester and two years as a Software Test Engineer and Senior Software Test Engineer before he was promoted to Solution Lead, all in St.  Louis.  (Doc. 95-7 at 5.)  He contends that, for a nine-month stretch during which he worked as a U3 Software Test Engineer, he was misclassified.  (Doc. 117-2 at 10:9-19, 18:14-21; Doc. 108-3 at 98:1-8.) During that period of time, his primary duty was "to provide hands-on client-facing support in the IT environment for Tech Mahindra's clients," by "troubleshooting and fixing issues that may arise with the application, deploying code, compiling production plans, answering questions from the production support team about the production plan and package, and participating in calls and meetings to discuss the status or ongoing issues of a project."  (Doc. 95-7 at 5-6.)

Meanwhile, Named Plaintiff Craddock testified that, for the first part of his thirteen months at Tech Mahindra, he worked as a U1 Associate Engineer and spent the majority of his time compiling daily and weekly reports, confirming the data, and passing that information to his supervisor.  (Doc. 118-4 at 26:1-7, 26:20-27:1.)  Working in Washington State, both inside an AT&T office and from home, Craddock later performed computer application testing, with a narrow focus on "troubleshooting and testing the rate plan section of [their client's] website." (*Id*. at 10:9-25, 22:23-23:22, 26:20-22.)   He never deployed code, compiled production plans, answered questions from the production support team, or had any involvement with the production plan or package—job duties Kumar expressly mentioned.  (*Id*. at 114:24-115:8.)

6

U2 Test Engineer Mustafa Baig testified that while he was based in Chicago, he spent forty to fifty percent of his time on the road conducting radiofrequency or "RF" field-testing on mobile devices and applications.  (Doc. 118-6 at 63:14-17, 121:9-12, 122:24-123:9.)  From his tests, Baig would create error logs and a "defect summary" which he would forward to his supervisor.  (*Id.* at 123:17-22.)  Neither Kumar nor Craddock conducted field tests.

Matthew Foster, who joined Tech Mahindra as a U1 Associate Software Engineer and has since been promoted to U2, testified that he has never field-tested software on mobile devices as Baig did.  (Doc. 118-3 at 160:4-6.)  Likewise, he did not compile production plans, answer questions from the production support team about the production package, and did not test any web applications like Kumar and Craddock did.  (*Id.* at 159:13-160:6.)  Instead, he worked at a desk inside an Atlanta AT&T office, where his job was to "troubleshoot and fix issues that ar[o]se within an application . . . by clearing the logs or . . . reverting the package back to another package."  (*Id.* at 159:1-7, 160:4-6.)

Darius Lyles testified that his job was to facilitate the assessment and resolution of "trouble tickets" filed by testers who identified problems with an application.  (Doc. 118-5 at 47:4-48:24.)  Neither Kumar, Craddock, Baig or Foster testified to doing similar work.  Lyles further testified that his work never changed in the four years he was employed by Tech Mahindra, even when he was promoted from U1 Associate Software Engineer to U2 Software Engineer and that he worked exclusively from home.  (*Id.* at 49:11- 20, 66:3-12.)  He did not field-test applications like Baig, troubleshoot issues within an application like Foster, or produce reports and troubleshoot websites like Craddock.  (*Id.* at 104:1-105:15.)  Nor did he deploy code, compile production plans, or work with the production team or production package like Kumar.  (*Id.* at 104:5-12.)

Tech Mahindra also argues that there was material variation in job duties among collective-action members who held the same job title.  (Doc. 117 at 6.)  It compares the declaration made by Plaintiff Kumar with declarations by supervisors who oversaw other U3 Senior Software Engineers Krishna Kovuru and Praneeth M.H.S.  (Docs. 95-7, 117-3, 117-4.)

According to his supervisor, Kovuru was a subject-matter expert and functional consultant for a Tech Mahindra client in Franklin, Tennessee.  (Doc. 117- at 1.)  In that role, Kovuru spent 60-65% of his time testing and configuring software enhancements in SAP – "enterprise resource planning software."  (*Id*.)  The bulk of his remaining time was spent consulting with the client's business analysts because "he was the [Tech Mahindra] team member primarily responsible for directly interfacing with [the client] to determine [the client's] functional specifications."  (*Id*. at 2.)  Kovuru's work also involved "writing functional test cases," working with the client to prepare "project documentation, including statements of work, project work orders, change order, and other deliverables," and "exploring options for improving functionality" in the SAP software application.  (*Id*.)

Meanwhile, Praneeth M.H.S.'s supervisor described the Senior Software Engineer's work as follows:

> Praneeth worked for Tech Mahindra's client . . . as an Oracle Agile PLM Technical lead.  "Oracle Agile PLM" is a product lifecycle management (PLM) software application used in the manufacturing industry.  This software application needs to be customized for every company that uses it to suit the company's functional specifications.
>
> As Technical Lead, Praneeth was the primary point of contact for [the client] with respect to the Oracle Agile PLM software application.  Pranteeth was primarily responsible for gathering requirements from [the client] for purposes of customizing the Oracle software application to meet [the client's] functional specifications.

(Doc. 117-4 at 1-2.)   As such, Praneeth spent a significant amount of time developing and modifying the Oracle application to fit the client's needs, as well as testing, validating, and performing quality control.  Tech Mahindra notes that Plaintiff Kumar's description of his duties as a U3 Senior Software Test Engineer does not mention the high level of client interaction or leadership obligations that Kuvalu and Praneeth describe.  (Doc. 95-7.)

Lastly, Tech Mahindra asserts that both Named Plaintiffs testified that their own employment included periods of time with significantly different primary duties.  (*Id*. at 6-7.)  As noted, Kumar asserts that he was misclassified for only a small portion of his time with Tech Mahindra.  (Doc. 117-2 at 10:9-19.)  From this, Tech Mahindra infers that Kumar's primary duties changed throughout his four-year employment and that, for most of his tenure, he was doing exempt work.  Craddock, meanwhile, testified that he had two completely different areas of focus in his thirteen-month employment with Tech Mahindra—five months compiling reports and seven months troubleshooting and testing a client's website.  (Doc. 118-4 at 26:1-22.)

Plaintiffs respond that Tech Mahindra's arguments mischaracterize the evidence and identify only "immaterial" differences.  (Doc. 131 at 5-11.)  They first note that the number of job titles, job bands, clients, supervisors, and projects is largely irrelevant.  (*Id*. at 5-6.)  Indeed, Plaintiffs argue, Tech Mahindra's job bands are based solely on an employee's tenure with the company and have no effect on the employee's job duties.  (*Id*. at 6.)  Likewise, Plaintiffs point to testimony from Tech Mahindra officials describing the primary duties of U1-U3 IT Delivery Engineers and characterize it as "a reasonably definite and finite set of tasks."  (*Id*. at 8.)

Plaintiffs also rely on a table in Tech Mahindra's Memorandum in Opposition to Class Certification that sets out "examples of the wide variety of job duties that may be performed by Tech Mahindra engineers on a day-to-day basis when working on each respective phase of the

[Software Development Life Cycle ('SDLC')]."  (Doc. 107 at 3-4.)  Plaintiffs present the table as proof that members of the collective do the same limited set of tasks regardless of job title, supervisor, client, or project.  (Doc. 131 at 8-9.)  In short, they argue that the members of collective are "sufficiently similarly situated in material ways" regardless of title, band, or assignment, insofar as none of their various duties meet the standard for exemption.

The Court concludes that there are substantial disparities in the factual and employment settings of the collective-action members.  The Court agrees with Plaintiffs that the existence of numerous job titles, job bands, supervisors, clients, or projects alone is insufficient.  Likewise, the Court recognizes that there is testimony from collective-action members describing similar job duties across different job titles and bands and while working for different supervisors and clients, as well as testimony that their work did not change when they were reassigned or promoted.  Still, the Court concludes that the testimony presented by Tech Mahindra identifies material variance in the primary duties of collective-action members.  Given that members work in different offices, on different projects, for different clients, and under different supervisors, the differences far exceed any similarities they share.  Accordingly, this factor weighs against a finding that the collective-action members are similarly situated and in favor of decertification.

### ii.    Fairness and Procedural Considerations

Next, Tech Mahindra argues that it would be unfair to proceed based on representative evidence in light of the significant and material variance among the primary d uties of the collective-action members.  (Doc. 117 at 15-19.)  Having already concluded that there are significant and material variations in the primary duties of the collective-action members, the Court concludes that it would be both unfair and logistically impossible to try this case on representative evidence.  Plaintiffs argue that their primary duties were not contingent on title,

10

band, supervisor, client, or project, but the Court sees no way that Plaintiffs could prove even that subsidiary point without putting on the testimony of most (or even all) of the collective-action members.

Put simply, Defendant's case relies on showing that the members' primary duties were significantly and materially different.  Plaintiffs' case relies on showing that those differences do not change the exemption analysis.  The Court does not see a clear method by which the trier-of-fact could answer either question without the majority of them testifying about their day-to-day work.  This factor weighs against a finding that the collective-action members are similarly situated and in favor of decertification.

### iii.    Defendant's Available Defenses

"[T]he application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof."  *14051 Manchester*, 301 F.R.D. at 386 (quoting *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)).  Tech Mahindra asserts that it is advancing three affirmative defenses:  the Computer Employee Exemption, 29 C.F.R. § 541.400; the Administrative Employee Exemption, 29 C.F.R. § 541.200; and the so-called Combination Exemption, 29 C.F.R. § 541.708.  (Doc. 117 at 16.)  Tech Mahindra states that some employees are exempt under one of the three exemptions and some are exempt under more than one.  (*Id*.)  Proving those defenses based on representative evidence would be difficult, Tech Mahindra argues.

Again, the Court concludes that the disparate factual settings of the Plaintiffs' work would prejudice Tech Mahindra's ability to prove its defenses.  Because Plaintiffs cannot easily demonstrate primary duty on a collective-wide basis, Tech Mahindra would be left advancing the

appropriate exemption defense against each individual.  This factor weighs against a finding that the collective-action members are similarly situated and in favor of decertification.

### iv.    *Common Policy of Misclassification*

Finally, Plaintiffs argue that they are similarly situated insofar as they are all subject to the same FLSA-violating policy.  (Doc. 131 at 11-14.)  As noted, the existence of a "unified policy, plan, or scheme of FLSA violations" can be sufficient to show that the Plaintiffs are similarly situated.  *14051 Manchester Inc.*, 301 F.R.D. at 372.

The Court concludes that Plaintiffs have not met their burden on this point.  Plaintiffs' argument boils down to their assertion that they are owed unpaid overtime because Tech Mahindra classified them as exempt.  (Doc. 131 at 12.)  "General allegations of an overarching employer policy are insufficient."  *14051 Manchester Inc.*, 301 F.R.D. at 374 (quoting *Martin v. Citizens Fin. Grp., Inc.,* CIV.A. 10–260, 2013 WL 1234081, at *3 (E.D. Pa. Mar. 27, 2013) (quotation marks omitted)).  That every member of the collective was classified as exempt is too general to establish that they are similarly situated, especially in light of the factual differences discussed above.

### b.  <u>Damages</u>

Tech Mahindra further argues that, in addition to the absence of a fair mechanism for establishing liability, there is no simple or equitable way to determine damages on a class-wide basis.  (Doc. 117 at 20-22.)  Representative evidence on the issue of damages is an acceptable method in class actions.  *See, e.g.*, *Anderson v. Mt. Clemons Pottery Co.*, 328 U.S. 680 (1946); *Drake*, 286 F. Supp. 3d at 1040.  However, in light of the Court's finding that the factual disparities are too great to allow the Plaintiffs to proceed as a collective action, it need not reach this issue.

12

### 3. Conclusion

Based on the foregoing, the Court concludes that Plaintiffs have failed to meet their burden of showing that the collective-action members are similarly situated and will decertify the FLSA class.

### Certification under Federal Rule 23(a)

Plaintiffs also seek to advance two separate class actions under Missouri and Washington law, defined as follows:

> **Missouri Class:** All persons employed by Defendant in Missouri as U1-U3 IT Delivery Engineers whose job it was to provide hands-on client facing IT services during the final two stages (testing and production support) of the software development lifecycle under any of the following job titles: Associate Engineer, Associate Software Engineer, Junior Software Engineer, Junior Technical Engineer, Network Engineer, Senior Network Engineer, Product Engineer, Senior Product Engineer, Test Engineer, Senior Test Engineer, Software Engineer, or Senior Software Engineer, from October 5, 2013, to present.

> **Washington Class:** All persons employed by Defendant in Washington as U1-U3 IT Delivery Engineers whose job it was to provide hands-on client facing IT services during the final two stages (testing and production support) of the software development lifecycle under any of the following job titles: Associate Engineer, Associate Software Engineer, Junior Software Engineer, Junior Technical Engineer, Network Engineer, Senior Network Engineer, Product Engineer, Senior Product Engineer, Test Engineer, Senior Test Engineer, Software Engineer, or Senior Software Engineer, from October 5, 2013, to present.

(Doc. 95-1 at 15.)

### 1. Legal Standard

As under the FLSA, plaintiffs may band together to advance state-law claims as a class under Federal Rule of Civil Procedure 23.  (Doc. 95.)  Although the standards differ, "it is not mere coincidence that courts facing parallel motions to decertify an FLSA collective action under § 216(b) and to certify a class action under Rule 23 have tended to allow either both actions or neither to proceed on a collective basis."  *Davenport v. Charter Commc'ns, LLC*, No.

4:12-cv-00007, 2017 WL 878029, at *8 (quoting *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 298-99 (S.D.N.Y. 2015)).

There are four requirements to advance a class action under Rule 23(a): (1) Numerosity—the class must be "so numerous that joinder of all members is impracticable"; (2) Commonality—"there are questions of law or fact common to the class"; (3) Typicality—"the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) Adequacy—"the representative parties will fairly and adequately protect the interests of the class." *14051 Manchester*, 301 F.R.D. at 379-80; Fed. R. Civ. P. 23(a); *see also Paxton v. Union Nat'l Bank,* 688 F.2d 552, 559 (8th Cir. 1982). In addition, the plaintiffs "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Davenport*, 302 F.R.D. at 528 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Plaintiffs proffer the "predominance" showing in Rule 23(b)(3): "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); (Doc. 95-1. at 15). The burden to show compliance with Rule 23's requirements is borne by the Plaintiffs. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013); *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994).

### 2. *Analysis*

Tech Mahindra concedes that the proposed class is numerous enough to support a Rule 23(a) class action. (Doc. 95-2 at ¶ 3; Doc. 107 (failing to challenge Plaintiff's numerosity claim).) Accordingly, Plaintiffs must show that they meet the commonality, typicality, and adequacy requirements, and show that the questions of fact and law common to the class predominate. "Because the analysis of the commonality and typicality requirements of Rule

23(a) tend to merge, the Court will focus on the commonality requirements of Rule 23(a)(2) and the predominance and superiority requirements of Rule 23(b)(3)," before considering adequacy. *Arnold*, 2017 WL 1251033, at *10 (citations omitted).

### a.  Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality is typically not difficult for class action plaintiffs to meet.  *14051 Manchester*, 301 F.R.D. at 380; *see also Rikard v. U.S. Auto Prot., L.L.C.*, 287 F.R.D. 486, 489-90 (E.D. Mo. 2012) ("The commonality requirement imposes a very light burden on a plaintiff seeking to certify a class and is easily satisfied.") (quoting *Mund v. EMCC, Inc.*, 259 F.R.D. 180, 183 (D. Minn. 2009)).  "[A]ny competently crafted class complaint literally raises common questions," but "[w]hat matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (citations omitted).

Plaintiffs' claim must "depend upon a common contention . . . of such a nature that . . . determination of its truth or falsity will resolve an issue that is central to the validity of each one of the [individual plaintiff's] claims in one stroke."  *Id*.  A single common question that meets this standard is enough to satisfy Rule 23(a)(2), and where Plaintiffs identify at least one common question, differences between class members' claims are less relevant.  *Id*. at 359 ("We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate*, but in order to determine (as Rule 23(a)(2) requires) whether there *is* even a single common question.").

Plaintiffs proffer four common questions:

1. Whether U1–U3 IT Delivery Engineers whose job it was to provide hands-on client-facing IT services during the final stages (testing and production support) of the SDLC perform the duties of computer systems analysts, computer programmers, software engineers, or similarly skilled workers within the meaning of the computer professional exemption;

2. Whether U1–U3 IT Delivery Engineers whose job it was to provide hands-on client-facing IT services during the final stages (testing and production support) of the SDLC worked overtime for which Tech M did not compensate them;

3. Whether Tech M failed to accurately record the number of hours that U1-U3 IT Delivery Engineers worked; and

4. Whether Tech M willfully misclassified U1-U3 IT Delivery Engineers whose job it was to provide hands-on client-facing IT services during the final stages (testing and production support) of the SDLC as exempt from overtime pay requirements, thereby depriving them of overtime pay

(Doc. 95-1 at 18.)   They further assert that each of those questions has a common answer because of Tech Mahindra's "uniform exemption classification . . . based on their similar job duties and job descriptions," Tech Mahindra's "uniform structured approach to providing IT services to its clients," and the class members' "common testimony about the final two phases of the SDLC in which the putative class members perform." (*Id*. at 18-19.)

The Court agrees that Plaintiffs' claims turn on one basic question common to all of them:  Did Tech Mahindra have a policy of misclassifying U1-U3 IT Delivery Engineers.  The Court also agrees that the answer to that question might resolve all of the members' claims "in one stroke." *Dukes*, 564 U.S. at 350.  The Court concludes that Plaintiffs have satisfied their "very light burden" of showing commonality. *Rikard*, 287 F.R.D. at 489-90.

### b.  <u>Predominance</u>

While the requirements to show commonality are not onerous, the Rule 23(b)(3) predominance inquiry is "far more demanding." *Luiken*, 705 F.3d at 377 (citation omitted). "The predominance inquiry requires an analysis of whether a prima facie showing of liability can

be proved by common evidence." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) (citing *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010)).  To that end, Rule 23(b)(3) "permits certification only if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Behrend*, 569 U.S. at 30.  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 136 S. Ct. at 1045 (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)).  If "one or more of the central issues in the action are common to the class and can be said to predominate," Rule 23 certification may be proper, "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (citation omitted).

As discussed above, the Court believes that there are significant and material differences between employees included in the class definitions that would make it extremely difficult to make a prima facie showing of liability based on common evidence. *Halvorson*, 718 F.3d at 778.  Plaintiffs argue that class members' day-to-day work is similar enough to show that their primary duties are exempt:

> "[A]ll perform routine testing and/or support work in the IT environment.  None of them work on the teams that are primarily tasked with gathering, designing, or developing the software application.  None have the primary job duty of consulting with users to determine what hardware, software, or system functional specifications the client should use, design processes for analyzing, installing, or maintaining computer systems, writing computer code or design software programs, designing or modify computer systems or prototypes, or making recommendations to Tech M's clients about how to design or modify their systems based on user specification.

(Doc. 95-1 at 24.)  Yet the Court cannot see how Plaintiffs could prove to the trier-of-fact that *all* of the class members perform the same routine work and that *none* of them have the primary duty of exempt work without presenting most, if not all, class members.

Plaintiffs argue that "all U1-U3 IT Delivery Engineers work pursuant to comprehensive and detailed processes, contracts, agreements, standards, and policies and procedures and their performance was measured based on adherence to these various policies." (*Id.*)  Thus, Plaintiffs argue, class members' work was strictly limited to a finite and tightly controlled list of duties. Yet Plaintiffs also assert that class members' work "depends not only on the job family he is assigned to, but also the phase of the SDLC he is assigned," (*id.* at 6), and that their duties "are highly prescribed and controlled" not only by internal Tech Mahindra procedures, but also numerous client-specific parameters which may be set out in a statement of work, master services agreement, managed services agreement, professional services contract, policy process manuals, or supplied management plans, (*id.* at 11).  In fact, Plaintiffs themselves note that the client often has "its own rules that U1-U3 IT Delivery Engineers are required to follow."  (*Id.* at 11.)  Even as Plaintiffs argue that class members "are required to strictly adhere to the various contracts, process and standards that control their work," (*id.* at 12), they are admitting that their work is highly dependent on contracts, processes, and standards that may change from client-to-client or project-to-project.  Those factual inquiries could not be answered absent testimony from a class member who was bound by each combination of internal and external controls—which could require dozens of witnesses.

In short, the Court concludes that each class members' primary duty was dependent on numerous factors.  Even if Plaintiff is correct that no combination of factors could give rise to an exempt primary duty, the trier-of-fact could not make such a finding without hearing testimony

18

from all or nearly all of the class members.  Accordingly, the Court concludes that the individual factual inquiries—and not the questions of law or fact common to class members—predominate.

### c.  <u>Superiority</u>

Rule 23(b)(3) also directs the Court to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  In so doing, the Court considers several factors:  (A) the class members' individual interests in controlling separate actions; (B) the extent and nature of any litigation concerning the controversy already begun; (C) the desirability of concentrating the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

The Court finds that, while the first three factors may support class certification, the significant number of differences between class members and witnesses necessary to prove liability makes proceeding as a class untenable.

### d.  <u>Adequacy</u>

Finally, Tech Mahindra argues that Named Plaintiffs Kumar and Craddock are not adequate representatives.  (Doc. 107 at 11.)  "The focus of Rule 23(a)(4) is whether:  (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel."  *Paxton*, 688 F.2d at 562–63 (citing *Gonzales v. Cassidy*, 474 F.2d 67, 72 (6th Cir. 1973)).

While the Court recognizes that both Named Plaintiffs share a common interest with the rest of the putative class and strong incentives to forcefully assert it—more specifically, they all seek unpaid overtime compensation—the Court also notes that there are significant issues regarding Named Plaintiffs' ability to represent the rest of the class.  Of special concern is

deposition testimony by both Kumar and Craddock that they know almost nothing about IT Delivery Engineers' work beyond their own experiences and that they are familiar with only a few other putative class members.  (*Id*. at 11-16.)  In fact, Kumar testified that he has never worked with anyone who held a different job title within the class definition.  (*Id*.)  The Court believes it may be difficult for Named Plaintiffs to adequately represent class members about whom they know so little.

In any event, while the Court finds that Kumar and Craddock may be adequate representatives of the class, the issue is ultimately moot in light of the Court's finding that certification is impracticable.

### *3.   Conclusion*

The Court concludes that certification under Rule 23(b) is not appropriate.  Specifically, the Court finds that the common question of exemption is predominated by the substantial and material differences in the day-to-day job experiences of putative class members.

### Conclusion

For the foregoing reasons, the Court will grant Tech Mahindra's motion to decertify the FLSA collective action and will deny Plaintiffs' motion to certify a class action under Rule 23(b).  To avoid prejudice to those Opt-in Plaintiffs who wish to file individual lawsuits, the Court will invoke its equitable powers to toll the applicable statutes of limitations for sixty days after entry of this Memorandum and Order.  *See Davenport*, 2017 WL 878029, at *11.

Accordingly

**IT IS HEREBY ORDERED** that Defendant Tech Mahindra (Americas) Inc.'s Motion for Decertification (Doc. 116), is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Class Certification (Doc. 95), is **DENIED.**  The claims of all opt-in Plaintiffs are **DISMISSED** without prejudice, leaving before the Court the claims of Named Plaintiffs Kumar and Craddock.  Plaintiffs' counsel shall notify the opt-in Plaintiffs that the collective action has been decertified and their FLSA claims are no longer pending before this Court and file a notice with the Court confirming that they have done so.

**IT IS FURTHER ORDERED** that the applicable statutes of limitations for the FLSA claims of the Plaintiffs who have opted into the collective action are tolled for period of sixty days from the date of this Memorandum and Order.

**IT IS FINALLY ORDERED** that within thirty days of the date of this Memorandum and Order, the remaining parties shall file a joint proposed schedule for the remainder of the litigation, including a proposed trial date.


Dated this 25th Day of March, 2019.


_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE